IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 6, 2015

**TRUTONIO YANCEY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 10-02855      J. Robert Carter, Jr., Judge**

_____

**No. W2014-00328-CCA-R3-PC  - Filed March 26, 2015**

_____

The petitioner, Trutonio Yancey, was convicted of aggravated robbery, especially aggravated kidnapping, carjacking, and employing a firearm during the commission of a dangerous felony and received an effective sentence of twenty years.  On direct appeal, this court affirmed the petitioner's aggravated robbery and especially aggravated kidnapping convictions but reversed the carjacking and firearm convictions and remanded for a new trial.[1]  The Tennessee Supreme Court denied application for permission to appeal.  State v. Trutonio Yancey and Bernard McThune, No. W2011-01543-CCA-R3-CD, 2012 WL 4057369, at *1 (Tenn. Crim. App. Sept. 17, 2012), perm. app. denied (Tenn. Jan. 14, 2013).  Subsequently, he filed a *pro se* petition for post-conviction relief, alleging he received the ineffective assistance of counsel at trial.  Counsel was appointed and, following an evidentiary hearing, the post-conviction court denied the petition.  Based upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

John Scott, Memphis, Tennessee, for the appellant, Trutonio Yancey.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Meghan Fowler, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]The State elected not to retry the carjacking and employing a firearm counts, and those counts were dismissed.  The petitioner's effective sentence remained at twenty years.

## OPINION

## FACTS

On direct appeal, this court set out the facts resulting in the petitioner's convictions:

The victim, Demario Brown, testified that on September 19, 2009, he was visiting his friend, appellant McThune, who was wheelchair bound. The victim said appellant McThune was "[j]ust hanging out," and the victim asked him if he wanted a drink. Appellant McThune told the victim to purchase a bottle of liquor from the store. As the victim was leaving to go to the store, a man whom the victim knew as "Blow," arrived at appellant McThune's house and spoke to appellant McThune. After Blow left, the victim told appellant McThune that Blow "wasn't straight." The victim explained that meant Blow was not "cool to kick [it] with."

The victim went to the liquor store, purchased a bottle of Crown Royal whiskey, and returned to appellant McThune's house. When he returned, [the petitioner], whom the victim knew as "Blue-Black," and another man, whom appellant knew as "Beball," were at appellant McThune's home. The victim stated that he met [the petitioner] through appellant McThune and had known him for "a couple of years." The four men went inside appellant McThune's house and entered his bedroom. The victim took a couple of sips from the bottle of whiskey and passed it to appellant McThune.

Appellant McThune began discussing the victim's comment about Blow not being "straight." [The petitioner] and Beball were sitting behind the victim. As the victim and appellant McThune were discussing Blow, [the petitioner] and Beball attacked him. The victim said, "[T]hey just came up with the guns, laid me down on the bed, choking me, started shooting the gun in the house, pulling my clothes off, going in my pockets, throwing my money, my phones and everything on the bed." The victim testified that [the petitioner] was on top of him and "in [his] face" while he was on the bed. He further testified that Beball had a ".45 gun." He did not know what type of gun [the petitioner] had. The victim had previously seen [the petitioner's] gun laid on the dresser and bed in the room, and he surmised that it was a ".9 or a .45." [The petitioner] shot his gun on the side of the victim's head. According to the victim, the men apparently thought he said they were the police. The victim said he and [the petitioner] were on the bed. Beball, who was standing beside the bed, took off the victim's shoes and pants and patted him down.

The victim stated that he had two cellular telephones and approximately $2,600 in cash in his pockets. He explained that he had such a large amount of cash because he had cashed two payroll checks that day. According to the victim, the men did not know he had the money.

Beball threw the victim's belongings onto the bed as he took them, and appellant McThune picked them up off the bed and placed them on his lap. The victim asked appellant McThune, who was sitting in his wheelchair at the edge of the bed, if he was going to allow the men to rob him. Appellant McThune responded that he did not have anything to do with what was occurring, and the victim should not have said what he had said. The victim said during the robbery, [the petitioner] "shot at least three or four times beside [the victim's] head and dropped the clip. . . ." After dropping the clip, [the petitioner] asked appellant McThune to get another clip for his gun from the kitchen table. Appellant McThune wheeled into the kitchen, retrieved the clip, and gave it to [the petitioner].

[The petitioner] and Beball lifted the victim off the bed and walked him outside at gunpoint. Appellant McThune's girlfriend, who was in the house during the robbery, told the men that the victim had locked his vehicle and that the keys were inside the vehicle. The victim explained that he left the car keys inside of the car and only carried the keyless entry device inside appellant McThune's house. The men went back inside to get the keyless entry device, and [the petitioner] unlocked the vehicle. They then forced the victim, who was wearing boxer shorts and a t-shirt, into the trunk at gunpoint; started the victim's car; and began driving.

The victim testified that he was nervous and started feeling around in the trunk for something with which to hit the lock. The victim said they were driving on interstate 240 when the men turned down the radio volume, and he heard them "saying something like I'm probably going to have to kill him or something." The victim found a four-way lug wrench in the trunk and beat the lock with it. The victim said [the petitioner] and Beball must have heard him hitting the lock because one of them fired a gunshot into the backseat.

The victim said it got "quiet and still" inside the vehicle. He felt around the trunk with his hand and pulled a wire, which caused his trunk release to open. No cars were behind them, and the victim jumped out of the trunk and rolled a few times. The vehicle was still moving when the victim jumped from it. When the victim arose, he saw that the driver of the vehicle had applied the

-3-

vehicle's brakes, so he ran to an Exxon station. He tried to borrow a cellular telephone at the Exxon, but nobody would allow him to use one. An Exxon employee noticed the victim and called the police. The victim said he had a few scars on his arms, legs, and ankles from jumping out of the vehicle.

The victim identified photographs of [the petitioner] and BeBall that the detectives showed him and stated that they were the men who robbed him. The victim also identified photographs of his vehicle and the four-way lug wrench. The victim said investigators found shell casings on the floorboard of his vehicle that he did not leave there.

On cross-examination by [the petitioner's] counsel, the victim testified that he arrived at appellant McThune's house around 5:00 p.m. He stayed for approximately three or four minutes before he left to go to the liquor store. He said it took him approximately three minutes to get to the liquor store, and he stayed at the store for about three minutes. The victim said the robbery started about ten minutes after he entered appellant McThune's house. He denied that he smoked marijuana while at the house. When asked whether he recalled stating to the police that "we [were] all sitting in the house getting high and drinking[,]" the victim answered, "No. I said we [were] drinking. They . . . they [were] all getting high." He said the officers probably left a couple of words out of his statement. He knew that he had not been smoking marijuana that night because he was on probation at that time and "was getting around the drug test." The victim had read and initialed each page of his statement. He could not recall at what time he made his statement. He said the police went to appellant McThune's house the night of the incident.

The victim recalled testifying at the preliminary hearing. He did not remember testifying that he was at appellant McThune's house for a couple hours or that he stated that they had been drinking and smoking marijuana. When shown the transcript of the preliminary hearing, the victim stated, "If it's on the paper[,] I guess that's what I said." When questioned further about his stating to police that the men had been drinking and smoking marijuana the night of the incident, the victim said, "If it's on there I may have made that statement[,] but I replied it was them smoking weed."

The victim had visited the house often, each time "hang[ing] out" in appellant McThune's bedroom. The victim said [the petitioner] lived at the house with appellant McThune. He recalled seeing [the petitioner] with a black ".45 gun" often and said [the petitioner] kept it on a dresser. According

-4-

to the victim, [the petitioner] must have had his gun on him when the victim entered the room the day of the robbery because he did not see the gun lying on the dresser. The victim denied telling the police that [the petitioner] had a .45 caliber automatic handgun and Beball had a .9mm or a .45. He further denied telling them the guns were silver with black handles. He did not recall what [the petitioner] and Beball were wearing, but he did not see any bulges in their clothing to suggest that they were carrying guns.

The victim testified that he was standing at the edge of the bed, "[s]o when everything happened [the petitioner] didn't have to do nothing [sic] but just push." The victim told police that "Blue-Black" had robbed him, but he testified that he also knew [the petitioner] as "Tony Ford." The victim testified that [the petitioner] and Beball did not push him into the trunk of the car. He explained that he climbed inside the trunk because the men had guns aimed at him. The victim denied telling police that [the petitioner] and McThune walked him outside at gunpoint and forced him in the trunk. He testified that appellant McThune remained inside when the men went outside to the victim's car. He remained in the trunk from the time they left South Goodlett Street until they reached the Millbranch Road exit of interstate 240.

The victim said he worked with knives and attempted to use a knife to pry open the hook on the trunk. When that did not work, he decided to use the four-way lug wrench to beat the lock. While he was in the trunk, the victim also attempted to tear his seat open to get to a phone that he kept in his armrest. He said the shot the men fired into the backseat did not hit him. The [victim] estimated that the vehicle was traveling 60-70 miles per hour when he jumped out of the trunk.

The victim said that when he spoke with investigators, he gave them appellant McThune's name. The investigators found a utility bill in appellant McThune's name and retrieved his address from it. They also found a picture of appellant McThune, which the victim used to identify him. The police drove the victim to the address they had found, and the victim told them that was where the robbery happened.

The victim recalled investigators asking him how he got out of the trunk. He said the answer reflected on his statement, he "hit it with . . . something," was inaccurate. He said he did not read his statement after the police wrote it. He just "signed and initialed it because [he knew he] made a statement."

The victim initially told police that he did not know Beball's name. The victim also told police a man named Tony was involved. He was unsure of Tony's last name and told them that it might have been Ford. The police showed the victim a picture of someone with the name Ford, but he was not the man who had robbed the victim.

On cross-examination by appellant McThune's counsel, the victim testified that he knew he was not smoking marijuana the night of the robbery because he was on probation and subject to random drug tests. When asked about his statement that they were "all sitting in the house getting high and drinking," the victim said the officer probably transcribed his statement incorrectly because he was talking fast. He said he signed the statement without reading it because he was "exhausted, tire[d], [and he] didn't have nothing [sic] on but boxing drawers. . . ."

The victim stated that he left the bedroom and went to the restroom after he drank the whiskey. He thought that the men decided to rob him when he left to use the restroom. The victim again denied that appellant McThune walked him outside of the house at gunpoint and forced him into the trunk. He said it would have been impossible for appellant McThune to walk him outside because appellant McThune was wheelchair bound.

The victim estimated that he arrived at appellant McThune's home sometime after 5:00 p.m. He further estimated that he was in the trunk of the vehicle for about six minutes. He did not recall signing his statement at 3:35 a.m. the following morning. The victim said the police brought him to the police station, researched the suspects, brought him to appellant McThune's house, and questioned him before he signed his statement.

The victim said he called Detective Smith with the Memphis Police Department regarding this case. The victim denied referring to appellant McThune as "Bernard Nathan." He said he did not know the suspects' last names when he went to the police station and "tried to pronounce McThune but couldn't come up with it." The victim further denied telling Detective Smith that he had been smoking marijuana the day of the incident.

On redirect examination, the victim testified that he dropped out of school in the eighth grade but had a diploma. When the police officer arrived at the Exxon station, he asked the victim what happened, why he ran, and how he got injured. He said when he talked to the detectives, "[t]hey didn't do a lot

-6-

of asking, [he] really told them what happened."

The victim explained that his saying Blow was "not straight" was an insult. He agreed that his saying that "could put [him] in jeopardy . . . in the community." He denied fabricating his story.

Memphis police officer David Galloway testified that he became involved in the investigation of this case when the victim's vehicle was towed to the crime scene office for processing. Officer Galloway processed the vehicle for fingerprints, photographed the vehicle, and collected evidence from the vehicle. He stated that he found a spent ".45 auto casing" on the floorboard behind the driver's seat. Officer Galloway identified photographs that he took of the vehicle, the vehicle's trunk, and the spent casing. He testified that he was unable to recover any useable fingerprints from the vehicle. On cross-examination, Officer Galloway testified that he did not find any gunshot holes in the vehicle. He further testified that, after searching the vehicle "[t]o the best of his ability," the spent casing was the only evidence he found.

Officer Smith Boyland with the Memphis Police Department testified that he responded to the call at the Exxon station. He recalled that the victim was wearing only boxer shorts and had injuries on his elbows and knees. Officer Boyland took a brief statement from the victim and offered him medical attention. He referred the case to the Felony Response Unit for further investigation. On cross-examination, he testified that he could not recall at what time he arrived at the Exxon station.

Both appellants waived their right to testify; however, [the petitioner] called Ms. Deborah Fuller as a witness. Ms. Fuller testified that she was engaged to [the petitioner]. She had known [the petitioner] for three years, and they lived together at the time of the incident. Ms. Fuller stated that on September 18, 2009, [the petitioner] was at home because he was ill. She further stated that he had a bleeding ulcer and was vomiting blood. She recalled that day because they were supposed to go to her son's twenty-second birthday party but could not because of [the petitioner's] illness. Ms. Fuller said [the petitioner] did not go to the hospital for treatment because he did not want to go through painful testing. She gave him some medicine, and he began to feel better.

Ms. Fuller stated that she did not tell the State's investigators that [the petitioner] was sick at home all day on the day of the incident. She said she "practically had forgotten about it." Ms. Fuller testified that she knew the penalties for lying under oath and that she would not lie to save [the petitioner].

On cross-examination, Ms. Fuller testified that she left work at 2:30 p.m. on September 18th. When she arrived at home, [the petitioner] was at their home in the bed. Ms. Fuller said [the petitioner] usually called her on her lunch breaks to let her know his location. She agreed she was not there to see him personally but said she trusted what he told her. According to Ms. Fuller, [the petitioner] was sick for approximately a week and a half. She said medical records showed that doctors diagnosed him with bleeding ulcers, but she did not have the records at trial.

Ms. Fuller spoke with investigators in January 2011. She told them that [the petitioner] was with her on September 18th. However, she did not tell investigators about her son's party when they initially spoke with her because she did not think about it. Ms. Fuller stated she could recall September 18th because something tragic happened; her sick fiancé would not go to the hospital even though she begged him to do so. She said [the petitioner] would normally go to the hospital on his own. She agreed that she could have called 9-1-1 so paramedics could examine [the petitioner] but did not.

Ms. Fuller stated that she visited [the petitioner] in jail. She wanted him to be released from jail so they could marry. She said she did not know the victim, but she knew appellant McThune and "[hung] out" at his house. She further stated that all of appellant McThune's friends were Caucasian except for her and [the petitioner].

After hearing the evidence, the jury deliberated and found [the petitioner] and appellant McThune guilty as charged. The trial court sentenced [the petitioner] to concurrent sentences of twenty years for especially aggravated kidnapping, ten years for aggravated robbery, and ten years for carjacking. The court sentenced him to six years for employing a firearm during the commission of a dangerous felony consecutive to the ten-year sentence for carjacking. [The petitioner] received an effective twenty-year sentence in the Tennessee Department of Correction. The court ordered that appellant McThune serve twelve years for aggravated robbery. Both appellants filed motions for new trials, which the trial court denied. They filed

separate appeals, which this court consolidated.

Id. at *1-6.

At the December 17, 2013 evidentiary hearing, the petitioner testified that he wanted to testify at trial, but trial counsel influenced him not to do so. The petitioner said he told the trial court that it was his decision not to testify based upon his attorney's advice. Trial counsel told the petitioner that he should not testify because he had a prior felony on his record. The petitioner agreed that ultimately it was his decision not to testify.

Trial counsel testified that he had been practicing law for twenty-one years and had tried over 100 jury trials. He said he did not consult with an expert as to whether a person could jump from a moving vehicle traveling 60-70 miles per hour and not sustain serious injury. As to the victim's testimony that he escaped from the trunk of the vehicle by "yanking on some wires," trial counsel said he did not consult with an expert as to whether it was possible to open a trunk in such a way but did mention it to a mechanic "in passing." He said that his trial strategy had been to bring out the inconsistencies in the victim's statements and to "attack the lack of physical evidence in the car as that did not corroborate [the victim's] story." However, counsel said that he "couldn't get around . . . the fact that the [victim] did end up in his underwear with scrapes all over him." Counsel said that he tried to establish an alibi for the petitioner through his girlfriend who was "a really good witness." However, the medical records she provided counsel were from ten months earlier and did not pertain to the night of the robbery. Counsel said that he brought out at trial "the complete lack of investigation by the police."

On cross-examination, trial counsel said that he was "[n]ot really" a part of the petitioner's decision not to testify and that the petitioner was "not telling the truth about that." Counsel thought that the petitioner would have been "a pretty good witness" and that his testimony would have been helpful for the defense theory. Counsel said that the petitioner's decision not to testify was entirely his own.

On redirect, trial counsel said that at the time of trial he was not aware of any expert witness that could testify about "road rash" but later heard that there might be one.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and subsequently entered a written order on January 30, 2014, denying relief.

**ANALYSIS**

The petitioner argues that he received ineffective assistance of trial counsel because

-9-

counsel failed to call expert witnesses to investigate the veracity of the victim's testimony and failed to strengthen the alibi testimony of the petitioner's girlfriend by presenting medical records that the petitioner was at the hospital during the time of the robbery.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687(1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In the context of a guilty plea, the petitioner must show a reasonable probability that were it not for the deficiencies in counsel's representation, he or she would not have pled guilty but would instead have insisted on proceeding to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985); House v. State, 44 S.W.3d 508, 516 (Tenn. 2001).

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

In the denying the petition, the post-conviction court concluded:

> The trial attorney stated that he wanted to point out the flaws in the victim's account, and couple that with the alibi proof that he did offer on behalf of Petitioner.

> At the trial, Petitioner's girlfriend testified that Petitioner was with her, nursing a stomach ache. He did not offer any medical proof of Petitioner's condition because the only proof available was from ten (10) months prior to the incident. Counsel testified that he thought that offering that evidence would weaken, rather than strengthen, the alibi.

> In summary, counsel thought the lack of corroboration offered by the State and the unusual circumstances outlined by the victim, coupled with the alibi testimony of the girlfriend gave Petitioner his best chance of a favorable outcome. Counsel also argued about the lack of physical corroboration of the victim[']s accounts, such as bullet holes.

> Petitioner's counsel was clearly prepared for trial and had a defense strategy that took into account the facts that were expected to be adduced at the trial.

>     . . . .

> In the case at hand, Petitioner has not shown any deficiency [on] the part of his attorney during or before the trial. The mere fact that the jury accredits the prosecution witnesses does not imply a failure on the part of the attorney. At the hearing, Petitioner has failed to demonstrate that any act or omission of trial counsel was so serious as to fall below the objective standard of "reasonableness under prevailing professional norms." Vaughn vs. State,

-11-

202 S.W.3d 106, 116 (Tenn. 2006).

We conclude that the record supports the post-conviction court's finding that counsel provided effective representation. Trial counsel testified that at the time of trial he was unaware of any expert witnesses who could refute the victim's story of escaping from the trunk of the moving vehicle without serious injury, but he did mention the issue to a mechanic "in passing." Counsel said that he "couldn't get around . . . the fact that the [victim] did end up in his underwear with scrapes all over him." Counsel said that the medical records provided to him by the petitioner's girlfriend were from ten months prior to the robbery. As this court has previously stated:

> When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel.

Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). In sum, the petitioner has failed to show that counsel was deficient in his representation. We conclude, therefore, that the petitioner is not entitled to post-conviction relief on the basis of his claim of ineffective assistance of counsel.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE

-12-